UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00034

STEVEN L. TAYLOR                                                                 Plaintiff

v.

COLORADO STATE UNIVERSITY, *et al*.                          Defendants

**MEMORANDUM OPINION**

This matter is before the Court upon Defendant Board of Governors for the Colorado State University System, as the governing body of Colorado State University's Motion for Summary Judgment.  (Docket No. 41.)  Plaintiff Steven Taylor has responded, (Docket No. 43), and Defendant has replied, (Docket No. 50).  This matter is now ripe for adjudication.  For the reasons that follow, Defendant's Motion for Summary Judgment, (Docket No. 41), will be GRANTED.  An appropriate Order of dismissal will issue concurrently with this Opinion.

BACKGROUND

Much of the relevant background was presented in the Court's prior Memorandum Opinion and Order entered on October 18, 2012.  (*See* Docket No. 42, at 1-5.)  Therefore, the Court will limit its recitation of the background facts here to those not previously addressed and that are pertinent to the instant Motion.

Plaintiff Steven Taylor was employed by Colorado State University (CSU) through its Center for Environmental[1] Management of Military Lands (CEMML) and worked at Fort Campbell, Kentucky, beginning February 12, 2001.  (Docket No. 41-3.) CSU, through its CEMML, entered into a cost-reimbursable agreement with the U.S. Department of Agriculture (USDA) Forest Service to provide conservation, research, and resource management services on public lands controlled by the U.S. Department of Defense (DoD).  That agreement provided specifically that either party could terminate the agreement, in whole or in part, at any time prior to contract's expiration on March 31, 2010.  (*See* Docket No. 41-2, at 7.)  Taylor was informed he had been hired by a January 25, 2001, appointment letter from CSU.  (Docket No. 41-3.)  In that appointment letter, Taylor was advised that his "position ha[d] been approved as a special appointment." (Docket No. 41-3.)  It went on, "As is the case with all special appointments at Colorado State University, the position is dependent upon the availability of funding."  (Docket No. 41-3.)  The job description for Taylor's position also stated in the second sentence of the first paragraph, "Position contingent upon the availability of funds."  (Docket No. 41-4.) Additionally, Taylor acknowledged in his deposition that he was informed his position depended on funding through the CEMML.  (Docket No. 43-2, at 17.)

Taylor states that while he was working for the Montgomery County Soil Conservation Service conducting a biological survey for Fort Campbell, he was invited by Beth Boren to apply for a position at Fort Campbell to be funded by CSU.  (*See*

---

[1] In CSU's Motion and in the Court's prior Memorandum Opinion and Order, the CEMML was identified as the "Center for *Environmental* Management of Military Lands."  (*See* Docket Nos. 41-1, at 2; 42, at 1.) It appears the name was changed sometime after Taylor's employment began, as his appointment letter refers to the "Center for *Ecological* Management of Military Lands."  (*See* Docket No. 41-3.)

Docket No. 43-2, at 13-14.)   Taylor recalls submitting an application and being interviewed over the phone; he also recalls being told when he was hired that he would be assisting Boren in "any technical stuff she had."  (Docket No. 43-2, at 14-15.)   Taylor acknowledges that Boren was not employed by CSU, (*see* Docket No. 43-2, at 17-18), and states that Bob Brozca at CSU was his designated superior, (Docket No. 43, at 2; 43-2, at 15).   Taylor describes his job duties as making conservation plans, conducting prescribed burnings, coordinating with other agencies to help maintain military lands, and ensuring that farmers who were farming military lands under lease "kept their conservation going."  (Docket No. 43-2, at 19.)   Taylor's payroll checks were issued to him by CSU.  (Docket No. 43-2, at 20.)   In an apparent effort to clarify the employment status of CSU personnel, Taylor received a memorandum dated January 2001 at the time he was hired explaining, among other things, who Taylor was employed by and outlining his employment in relation to Fort Campbell and the DoD:

> SUBJECT:  Employment Status and Information
>
> . . . . If you receive pay checks from CSU, you are an employee of the State of Colorado, not CERL, an installation, the Air Force, DOA, or DOD.  Always identify yourself as a CSU employee to avoid confusion and potential problems. . . . I know many of you have been told you work for someone other than CSU, which is not the case.

(Docket No. 50-2, at 1.)

Boren, a DoD employee, was Taylor's point of contact for purposes CSU's contract at Fort Campbell.  According to Taylor, Boren gave him his daily instructions as to what he was to work on.  (Docket Nos. 43, at 2; 43-2, at 20.)   However, a memorandum provided to Taylor at the time he was hired informed him, "You and your

POC [point of contact] *should discuss and agree on your daily activities*, work hours, and time off."  (Docket No. 50-2 (emphasis added).)  In her signed declaration, Boren expressly disclaims that her position as CSU's point of contact "[wa]s not a supervisory role."  (Docket No. 50-5, at 1.)  Consistent with the January 2001 memorandum Taylor received, Boren states:  "Specific tasks and requirements were outlined in the Scope of Work (SOW) and the CSU employee and I would review these tasks to discuss particulars and the time line in which tasks were to be completed.  Periodically, tasks were reviewed by both parties and time lines or procedures were adjusted due to unforeseen circumstances [but] very little day to day interaction was needed."  (Docket No. 50-5, at 1-2.)

Taylor also says that Boren "promulgated the safety rules that [he] was required to follow"[2] and "was responsible for [his] annual performance evaluations."  (Docket No. 43, at 2.)  However, the same January 2001 memorandum explains more clearly that Boren's role in the evaluation process, as Taylor's point of contact, was to receive and input responses to a CSU questionnaire, which Taylor would then sign and return to CSU.[3]  (*See* Docket No. 50-2, at 2.)  Boren also states in her signed declaration that: "only employees of CSU have the authority to . . . complete performance appraisals . . . . I merely verified or forwarded information to CSU personnel working with the

[2] In support of his statement that Boren "promulgated . . . safety rules," Taylor cites page 54 of his deposition testimony, (Docket No. 43-2, at 54.) However, Taylor's testimony there was in response to questioning whether Boren had ever raised any performance concerns and discusses primarily a letter sent by Boren to Dr. Steve Warren at CSU indicating safety concerns with Taylor wearing shorts rather than pants to work. (*See* Docket No. 43-2, at 52-54.)

[3] In fact, Taylor most recent evaluation form dated May 2008 lists his supervisor as Dr. Warren and is signed by Dr. Warren and Angela Thompson, the CEMML Director.  (Docket No. 50-3, at 1.)  Nowhere on the evaluation does Boren's name or signature appear.

[Agricultural Outlease Program].”   (Docket No. 50-5, at 1.)   Boren also avers: “My signature on performance evaluations was to verify that the CSU employee had completed their part.  I did not write the performance evaluations for Mr. Taylor or any other CSU employee.” (Docket No. 50-5, at 1.)   Consistent with the January 2001 memorandum and Boren’s statements, correspondence between CSU and Boren suggests that Boren was merely the go-between for transmitting Taylor’s evaluation form from CSU to Taylor and then back to CSU.  (*See* Docket No. 50-4.)  Although CSU on at least one occasion invited Boren to provide feedback regarding Taylor’s performance, this was apparently optional for Boren to do, and CSU reiterated at that time that CSU was responsible for completing Taylor’s evaluation.  (*See* Docket No. 50-4.)

Taylor avers that when he needed to take time off work to attend a rehabilitation program for his alcoholism, “it was Boren who preapproved his leave.”  (Docket No. 43, at 2 (referencing Docket No. 43-2, at 28).)   This statement, however, appears contrary to the documentary evidence of record for several reasons.   For one, the medical certification form Taylor was required to submit for FMLA leave was a CSU form to be completed by Taylor and his treating physician; it appears to have nothing to do with Boren, the DoD, or Fort Campbell.  (*See* Docket No. 41-13.)  Second, the notification letter informing Taylor that his request for FMLA leave had been approved was on a CSU form, was completed and signed by CSU/CEMML human resources director Angela Thompson (Thompson), and informed Taylor that he should contact Thompson if his expected return date changed.  (*See* Docket No. 41-14, at 2.)  Third, Boren, in her signed declaration, states that because “[t]he POC is not a supervisory role . . . only employees of CSU have the authority to approve leave.”  (Docket No. 50-5, at 1.)  According to

Boren, her "signature on leave documents was to verify, not approve, that these documents were accurate before reported to CEMML."  (Docket No. 50-5, at 1.)

Taylor further states that it was his "understanding of his relationship with Boren that he needed to go to her first, then go to CSU for his work issues, if necessary." (Docket No. 43, at 2 (referencing Docket No. 43-2, at 25).)   But this statement is also contradicted by the documentary evidence of record.   Namely, the January 2001 memorandum Taylor received when he was hired informed him that "questions concerning payroll, benefits, leave policies, employment regulations, worker's compensation, etc." should be directed to CSU/CEMML human resources.  (Docket No. 50-2, at 1.)  That memorandum also informed Taylor that should a difficult situation develop with his point of contact (*i.e.*, Boren), he should contact CSU, as well as that all "leave report forms" for annual or sick leave should be sent to CSU.  (Docket No. 50-2, at 1.)

Finally, Taylor avers that the DoD "supplied [him] with much of the equipment he used in his work, such as four-wheelers and tractors."  (Docket No. 43, at 2 (referencing Docket No. 43-2, at 55).)  However, the cost-reimbursable agreement between the USDA Forest Service and CSU expressly provides that CSU is responsible for providing all "equipment needed for work under this agreement," and states that "[f]ederal funding under this instrument is not available for reimbursement of [CSU's] purchase of equipment."  (Docket No. 41-2, at 5, 9.)  The "Agricultural Outlease Program Support" guidelines further delineate what equipment was to be government-furnished ("[o]ffice space, furniture, computer equipment, telephone, . . .") and what was to be provided by CSU/CEMML (cellular phone service, work boots, and personal protective equipment).

(Docket No. 50-1.)  And according to Boren, "[t]raining, travel, work boots, and Personal Protective Equipment (PPE) were the responsibility of CSU."  (Docket No. 50-5, at 2.) Boren further states:  "Equipment maintained by AOP [the Agricultural Outlease Program] was purchased for use by all Environmental Division Branch and other Division personnel in support of the mission at Fort Campbell.  This equipment was in use by the AOP prior to initiation of any contract with CSU or its personnel."  (Docket No. 50-5, at 2.)

In the summer of 2008, Taylor's physician advised him to immediately enter an alcohol rehabilitation clinic because of the effect his alcoholism was having on his diabetes.  (Docket No. 43, at 3.)  Taylor contacted Boren to notify her that he would need to use some of his accrued leave to enter the program.  He alleges that she responded, "I'm not working with no F-ing alcoholic."  (Docket No. 43-2, at 46-47.)  Shortly thereafter, Boren emailed Dr. Steve Warren at CSU requesting "CEMML to have all the government keys . . . issued to [Taylor] to be returned immediately by mail to Fort Campbell."  (Docket No. 41-9.)   For her part, Boren denies making the remarks Taylor alleges, stating:

> I did not, at any time, make any discriminating or derogatory statements to or about Steve Taylor or his medical conditions. . . . In fact, two years previous, when he told me he needed to seek treatment for his alcoholism, I encouraged him to do so and supported him fully. . . . At no time did I ever say I would not work with an alcoholic, not two years ago, and not in 2008.  I simply made no such statement to Mr. Taylor or anyone else.

(Docket No. 50-5, at 3.)

Thompson was contacted on June 25, 2008,[4] by Deniece Gillispie (Gillispie), Taylor's daughter, who informed Thompson of Taylor's medical conditions and that he would need to take leave. (Docket No. 43-4, at 1.) Gillispie related to Thompson that Taylor "was having problems" with Boren and that Boren had "made remarks to [him] that indicated an intolerance for individuals who are alcoholics." (Docket No. 43-4, at 1.) Gillispie also asked whether there might be other positions available through CSU at Fort Campbell. (Docket No. 43-4, at 2.) On June 27, 2008, Thompson responded by emailing Gillispie a CSU medical certification form for Taylor to complete for FMLA purposes and advising Gillispie as to two possible upcoming job openings with CSU. (Docket Nos. 41-10; 43-4, at 2.)

Also on June 27, 2008, Dr. Warren wrote to Thompson in response to Gillispie's email, advising Thompson, "If Steven [Taylor] is entitled to any assistance through the CSU Benefits Office, we should let him know." (Docket No. 43-5, at 1.) Thompson replied to Dr. Warren, informing him that she had sent the FMLA forms to Gillispie and stating:

> We should not do anything negative to [Taylor] based on this, including removing his keys and access card. As far as I know, he has never had performance problems and has never been under the influence at work. With all the information I have at this point, we should only consider him out on sick leave for 2 weeks. No action against him is needed.

(Docket No. 43-5, at 1.) Thompson also noted that based on what Gillispie had told her, it appeared Boren had "crossed the line." (Docket No. 43-5, at 1.) In accordance with

---

[4] Of note, also on June 25 CSU approved a 5% raise for Taylor beginning July 1, 2008. (*See* Docket No. 41-15.)

Thompson's recommendation and in spite of Boren's request, CSU made no effort to obtain Taylor's keys.  (Docket No. 43-4, at 2.)

On July 8, 2008, Taylor submitted his CSU medical certification form indicating he would be absent from work through July 20.  (*See* Docket Nos. 41-13; 43-4, at 2.) CSU approved Taylor for FMLA leave, and Thompson contacted CSU's Office of Equal Opportunity and Diversity to advise them that Taylor may need to be assessed to determine whether he meets the disability requirements under the Americans with Disabilities Act (ADA).  (Docket No. 43-4, at 3.)

Then on July 15, 2008, Dr. Warren received an email notifying him that Fort Campbell wanted to terminate its agreement with CSU as of July 21.  (Docket No. 41-16.)  And on July 17, the USDA Forest Service received a Military Interdepartmental Purchase Request reflecting a new termination date of July 21, 2008.  (Docket No. 41-17.)  That same day, Dr. Warren wrote to Taylor informing him that the USDA Forest Service wished to terminate its agreement with CSU effective July 21.  (Docket No. 41-18.)  Dr. Warren further advised Taylor:

> Due to the termination of the Agreement by the Forest Service, and pursuant to your appointment letter dated January 25, 2001, which reiterates that your position is "dependent upon the availability of funding", CSU will no longer have funding to continue your employment. . . .
>
> Should you be willing to relocate, please feel free to call Angela Thompson in the [CEMML] Human Resources Office, or log on to the CEMML website to see what positions might be available with CEMML.  You will be given full consideration for any position for which you may qualify.

(Docket No. 41-18.) Taylor learned of Warren's letter after he left the rehabilitation program. (*See* Docket No. 41-8, at 14.)

Taylor filed the instant suit against CSU on March 7, 2011. (Docket No. 1.) He thereafter filed an Amended Complaint adding the Secretary of the Army (Army) as a codefendant. (*See* Docket Nos. 22; 25.) The Army filed a motion to dismiss or, in the alternative, for summary judgment on March 4, 2012. (Docket No. 35.) After considering the Army's motion and Taylor's response, this Court granted summary judgment to the Army on October 18, 2012.[5] (Docket No. 42.) CSU then filed the instant Motion for Summary Judgment on October 1, 2012. (Docket No. 41.)

CSU argues that summary judgment is appropriate for several reasons: (1) CSU did not violate the ADA because it did not discriminate against Taylor on the basis of his disability when his employment was terminated; (2) CSU also did not violate the Vocational Rehabilitation Act of 1973 (Rehabilitation Act), and Taylor has presented no evidence showing he was terminated solely because of his disability; (3) the DoD is not Taylor's joint employer and, therefore, the motives and actions of the DoD cannot be attributed to CSU; and (4) because Boren was not CSU's agent, CSU cannot be not liable for her actions under *respondeat superior*. (Docket No. 41-1, at 8, 11, 12, 14.) Taylor responds with essentially two lines of argument: (1) that CSU was aware of Boren's conduct and terminated him anyway, which he reasons presents facts on which "a reasonable jury could conclude that [his] termination was based on his disability"; and (2) that CSU should be liable for the DoD and Boren's actions "under the 'joint employer'

---

[5] Taylor has since filed a Motion for Reconsideration (erroneously styled as "Motion for Extension of Time to File Response"). (Docket No. 46.) That Motion has yet to be ruled upon by the Court.

doctrine." (Docket No. 43, at 4-5.)   For the reasons that follow, the Court finds summary judgment is appropriate as to Taylor's claims against remaining Defendant CSU.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . .

citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## DISCUSSION

The ADA prohibits discrimination by covered entities "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. A plaintiff can prove disability discrimination by "direct evidence that the employer relied on [his] disability in making an adverse employment decision, or if the employer admits reliance on the handicap." *Monette*, 90 F.3d at 1186. Absent direct evidence of discrimination, the burden-shifting framework of *McDonnell Douglas Corp. v. Green* applies. *Shoemaker v. E.I. DuPont de Nemours & Co.*, 405 F. App'x 16, 18 (6th Cir. 2010) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)); *see also Monette*, 90 F.3d at 1186. Under this approach, "[t]he plaintiff must first establish a *prima facie* case of discrimination." *Shoemaker*, 405 F. App'x at 18 (citing *Monette*, 90 F.3d at 1186). This burden "is not onerous"; rather, a plaintiff's burden at the summary judgment stage "is merely to present evidence from which a reasonable jury could conclude that [he] suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1918)), *abrogated on other grounds by Lewis*, 681 F.3d 312. Thus, a

plaintiff must typically show: (1) he is a member of a protected class (*i.e.*, he is "disabled"); (2) he was otherwise qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances under which he suffered that action give rise to the inference of unlawful discrimination—or, stated differently, that there is a nexus between the adverse action and his disability.  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802; *Monette*, 90 F.3d at 1177-86).  Once a *prima facie* case is established, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.  *Id.* (citing *Monette*, 90 F.3d at 1186).  If the defendant offers sufficient evidence of a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination."  *Id.* (citing *Monette*, 90 F.3d at 1186).

Similarly, the Rehabilitation Act prohibits discrimination against otherwise qualified individuals on account of their disability in regard to participation in, or receiving the benefits of, "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.  Under the Rehabilitation Act, a plaintiff may establish a *prima facie* case by showing: (1) he is a "handicapped person"; (2) he is otherwise qualified to participate in the program; (3) he "is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap"; [6] and (4) the program is receiving federal financial assistance. *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995).

---

[6] In the Sixth Circuit's recent decision in *Lewis*, the court of appeals clarified that the causation standard for ADA claims is not, as had been previously interpreted, the higher "solely by reason of" standard.  681 F.3d

I.     **Taylor's ADA Claim Against CSU Fails as a Matter of Law**

Taylor alleges as the basis for his ADA claim that he was terminated because of disability discrimination on the part of Boren who told him she would not work with an alcoholic.  (*See* Docket No. 43-2, at 46-47.)  CSU argues that under either the direct or indirect method of proof, Taylor's ADA claim against it fails as a matter of law.  CSU concedes that Taylor qualifies as "disabled" for purposes of the ADA and that he suffered an adverse employment action when his position was terminated; however, CSU maintains that there is no evidence to suggest that CSU terminated Taylor because of his disability.  (*See* Docket No. 41-1, at 9.)  Taylor responds, arguing that CSU was aware that Boren was unlawfully attempting to terminate him, and "yet they terminated Taylor's employment anyway."  (Docket No. 43, at 4-5.)

Taylor does not allege any unlawful conduct on the part of CSU aside from the fact that it was CSU that terminated his position.  Thus, as an initial matter, the Court questions whether the evidence of record even establishes a *prima facie* case against CSU, because Taylor has not established a clear nexus between CSU's act of terminating his position and any alleged unlawful discrimination by a non-CSU employee who played no direct role in CSU's decision to terminate Taylor's employment.  However, even if the evidence were sufficient to establish a *prima facie* case against CSU, Taylor has failed to offer any evidence showing that CSU's proffered nondiscriminatory reason for terminating him was merely pretext for its true discriminatory intent.  CSU states that its decision to terminate Taylor was based solely on the fact that funding for his position

at 315-16.  However, under the plain language of 42 U.S.C. § 794(a), that standard remains applicable for Rehabilitation Act claims.  *Id.*

ceased when the USDA Forest Service elected to unilaterally terminate its contract with CSU. CSU maintains it did not participate in the decision to end that agreement and insists it had no authority to challenge the USDA Forest Service's decision because the contract expressly provided that either party could unilaterally terminate the agreement at any time. According to CSU, because Taylor's position was funded entirely through that agreement, when the contract was terminated the funding ended; therefore, it had no choice but to terminate Taylor's position and, thus, to terminate Taylor.

CSU's position here is supported by the evidence of record and appears to the Court a legitimate, nondiscriminatory explanation for the adverse employment action suffered by Taylor. Moreover, CSU's actions before Taylor entered rehab and while he was there evince no discriminatory motives on CSU's part; in fact, CSU's actions suggest just the opposite. CSU did not terminate Taylor when he decided to enter rehab. When Boren requested that CSU reclaim all of Taylor's keys and return them to Ft. Campbell, CSU refused. When Taylor's daughter, Gillispie, advised CSU that Taylor needed to take leave, CSU provided her the necessary forms and then approved Taylor's FMLA leave. What's more, while Taylor was in rehab, CSU gave him a raise. When Gillispie asked whether CSU had any other positions available, CSU provided her information regarding several positions. And when CSU notified Taylor that the USDA Forest Service had terminated its agreement with CSU thereby eliminating funding for Taylor's position, CSU encouraged Taylor to apply for other positions, assuring him he would be given full consideration. This evidence suggests no pretext for Taylor's termination, but rather buttresses CSU's nondiscriminatory explanation for why Taylor was terminated.

In sum, Taylor has produced no direct evidence of discrimination on the part of CSU in its terminating his position.  And under the burden-shifting framework for proving discrimination by indirect evidence, the Court is satisfied that even if Taylor has established a *prima facie* case, he has offered no evidence tending to show that CSU's proffered reason for terminating him is merely pretext for its true discriminatory intent.  Therefore, the Court finds no genuine issue of material fact here so as to preclude summary judgment on Taylor's ADA claim against CSU.

## II.     Taylor's Rehabilitation Act Claim Against CSU Also Fails.

Taylor alleges that CSU violated the Rehabilitation Act by terminating his position.  As previously noted, unlike the ADA, the Rehabilitation Act requires proof that Taylor was terminated *solely by reason of* his disability.  *See* 42 U.S.C. § 794(a); *Lewis*, 681 F.3d at 315-16.  CSU argues that even assuming Taylor could establish that he is a "handicapped person" with meaning of the Act, is "otherwise qualified," and that the relevant program receives federal funding, he has produced no evidence to suggest that CSU terminated him because of his handicap, much less *solely by reason of* his handicap.  CSU has established that it terminated Taylor's position when the USDA Forest Service unilaterally terminated the contract with CSU under which Taylor's position was funded.  And, as CSU points out, Taylor was aware from the time he was hired that his position was entirely dependent on outside funding.  Here, that funding ended causing CSU to terminate Taylor's position.  Taylor did not address his Rehabilitation Act claim in responding to CSU's instant Motion.  Regardless, the Court finds that Taylor has presented no genuine issues of material fact as to whether CSU violated the

Rehabilitation Act by terminating his position.   As such, summary judgment is appropriate.

**III.     CSU Is Not Liable for the DoD's Motives or Actions Regarding Taylor's Termination Under Either the "Joint Employer" Doctrine or *Respondeat Superior*.**

Taylor expressly seeks to hold CSU liable under the "joint employer" doctrine for the alleged discriminatory actions of the DoD and Boren.   (*See* Docket No. 43, at 5.) CSU argues that the DoD is not Taylor's joint employer and that its actions and motives are therefore not attributable to CSU.   CSU also argues it is not liable for Boren's conduct under a theory of *respondeat superior* because Boren was not its agent.   After reviewing the evidence of record and the parties' arguments, the Court concludes that CSU cannot be held liable under either theory.

**A.     The DoD was not Taylor's joint employer.**

An entity that does not otherwise meet the definition of "employer" may still be liable under the joint-employer doctrine.[7]   *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011).   "The joint-employer doctrine involves a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer."   *Id.*; *see also Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997); *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985).   In *Carrier Corp. v. NLRB*, the Sixth Circuit identified the proper legal standard to determine whether a joint-employer relationship exists as: "[W]here two or more employers exert significant control over the same

---

[7] Although the joint-employer doctrine developed in the labor relations context, the concept has since been imported into the civil rights context.   *See, e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.3 (6th Cir. 1997).

employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment—they constitute 'joint employers.'"  768 F.2d at 781 (alteration in original) (quoting *NLRB v. Browning-Ferris Indus. of Penn., Inc.*, 691 F.2d 1117, 1124 (3d Cir. 1982)).  Among the factors recognized by the Sixth Circuit for determining whether a joint-employer relationship exists are: "the right to hire, discharge, train, and pay employees, and to determine such employees' compensation." *3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 660 (6th Cir. 2003).  Other courts in this Circuit have considered similar factors, including: "the 'authority to hire, fire and discipline employees, promulgation of work rules and conditions of employment, issuance of work assignments and instructions, and supervision of employees' day-to-day activities.'"  *Russell v. Bronson Heating & Cooling*, 345 F. Supp. 2d 761, 771 (E.D. Mich. 2004) (quoting *EEOC v. Regency Windsor Mgmt. Co.*, 862 F. Supp. 189, 191 (W.D. Mich. 1994)).

Taylor urges the Court to find that the DoD was his joint employer based on several of these factors.  First, he argues that he "had very infrequent contact with his putative supervisor in Colorado," and "it was Boren who gave [him] his daily work assignments."  (Docket No. 43, at 6.)  To this end, he references the court's opinion in *Carrier* where it found facts supporting a joint-employer relationship in that Carrier, who leased truck drivers from Pacemaker Driver Services, "exercised substantial day-to-day control over the drivers' working conditions, while the drivers had only infrequent contact with Pacemaker."  768 F.2d at 781.  Second, Taylor asserts that the DoD provided the "office space, and much of the tools he needed to perform his work."  (Docket No. 43, at 6.)  Third, he says "[i]t was Boren, and not CSU, that worked with Taylor to perform

his annual performance evaluations." (Docket No. 43, at 6.) Fourth, Taylor posits that "it was Boren who initially recruited [him] to work at Fort Campbell." (Docket No. 43, at 6.) Finally, he argues that the DoD had the power to terminate his employment. (Docket No. 43, at 6.)

The Court cannot agree, however, that the evidence of record establishes a genuine issue of fact whether the DoD was Taylor's joint employer. The facts here simply do not show that CSU and the DoD shared or codetermined the essential terms and conditions of Taylor's employment. For one, Taylor's assertion that Boren gave him his daily work assignments is not supported by any evidence and, in fact, is contrary to the bulk of evidence in the record. Documentation from CSU throughout Taylor's employment shows that Boren had no apparent control over Taylor's work but, at most, that Taylor was to coordinate with Boren as his point of contact, not his supervisor, regarding the projects he worked on.

In *Carrier*, one of the decisions on which Taylor relies, the court found "there was evidence suggesting that Pacemaker officials consulted with Carrier officials over wages and fringe benefits for the drivers" and that "under Carrier's leasing agreement with Pacemaker, Carrier had the authority to reject any driver that did not meet its standards and could also direct Pacemaker to remove any driver whose conduct was not in Carrier's best interests." 768 F.2d at 781. The facts here are wholly distinguishable. There is no evidence suggesting that CSU ever consulted with the DoD regarding Taylor's pay or benefits, nor that the DoD had any authority to control Taylor's daily activities or reject his employment. There is likewise no evidence to suggest that the DoD had the authority to terminate Taylor. This is most clearly shown by Boren's request that Taylor's keys be

obtained by CSU and returned to Fort Campbell, which CSU denied.  If the DoD or Boren had any authority to reject Taylor's employment, terminate him, or control his activities, there would have been no need to request CSU take any action; Boren could have simply ordered Taylor to return the keys herself or advised CSU that the DoD was rejecting Taylor as an employee.  Further, despite his assertion that the DoD had the power to terminate his employment, the evidence of record clearly reflects otherwise.  If the DoD or Boren actually had that power, it (or she) could have fired him.

Moreover, the evidence reflects that the essential terms and conditions of Taylor's employment were squarely within the control of CSU, not the DoD.  Boren may have notified Taylor of the position initially and even recommended him for it, but Taylor's own testimony shows that he still had to apply to CSU for the job and interview with CSU personnel.  There is nothing to suggest that the DoD or anyone outside CSU had the authority to decide whether ultimately to hire Taylor.  There is likewise nothing to suggest that the DoD or Boren had any control whatsoever over Taylor's compensation. He was paid directly by CSU, and CSU provided all the benefits of his employment.  And when he requested leave, he did so through CSU, which was then considered and approved solely by CSU.  That the DoD may have supplied some of the equipment and/or workspace Taylor utilized during his employment with CSU does not establish, in light of the entirety of the situation, that the DoD was Taylor's joint employer.  Nor does the fact that Boren may have written some safety procedures give rise to a joint-employer relationship between the DoD and CSU (particularly given that Taylor has produced no further evidence of these regulations or to suggest that he would have been actually required to follow them).

Therefore, based on the factors considered by the Sixth Circuit and other courts for determining whether a joint-employer relationship exists, the Court finds that the DoD was not Taylor's joint employer.  The facts simply do not show that CSU and the DoD shared or codetermined the essential terms and conditions of Taylor's employment.  Accordingly, because the Court finds no genuine issues of material fact regarding the status of CSU as Taylor's employer, summary judgment is appropriate.

> **B.      CSU is not liable for Boren's actions under *respondeat superior* because Boren was not CSU's agent.**

Taylor alleges in his Second Amended Complaint that because Boren was CSU's agent by serving as his DoD point of contact, CSU is responsible for her actions under the theory of *respondeat superior*.  (Docket No. 1, at 3.)   CSU argues in its instant Motion that Taylor has offered no evidence to suggest that CSU delegated control and supervision of him to Boren or that Boren was CSU's agent.  (Docket No. 41-1, at 15.)  Taylor did not respond to this line of argument in his Response, instead focusing entirely on whether the DoD was his joint employer.  Regardless, the Court is convinced based on the evidence of record that no genuine issue of material fact exists as to whether Boren was CSU's agent or whether CSU could be liable for Boren's actions under *respondeat superior*.

The theory of *respondeat superior* is founded on the principles of agency.  Under that approach, a principal may be vicariously liable for the actions of its agent only if "the agent acts for the benefit of the principal within the scope of employment."  *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998).  "An agent is one who consents to act on behalf of another and subject to the other's control."  *Swallows*, 128 F.3d at 996 (citing Restatement (Second) of Agency § 1 (1958)).  In the context of federal

discrimination statutes, the agent "must be an agent with respect to employment practices." *Id.* (citing, *e.g.*, *Deal v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 5 F.3d 117, 119 (5th Cir. 1993)).

Other than his conclusory statements that Boren was CSU's agent, Taylor has produced no evidence suggesting that Boren acted on behalf of CSU within the scope of her employment or was in any way subject to CSU's control.  That Taylor does not defend this position in his Response is telling.  Based on its discussion above and its review of the record, the Court finds no evidence that CSU delegated to either Boren or the DoD the authority to make employment decisions on its behalf, nor that CSU exercised the requisite control over either Boren or the DoD's decisions.  Therefore, neither the DoD nor Boren can be considered Taylor's employer for purposes of his discrimination claims on the basis that either was acting as CSU's agent.

CONCLUSION

For the foregoing reasons, Defendant CSU's Motion for Summary Judgment, (Docket No. 41), will be GRANTED.  Because CSU is the only remaining defendant in this action, an appropriate Order of dismissal will issue concurrently with this Opinion.

Date:

cc:      Counsel