UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:11-CV-00034-TBR

STEVEN L. TAYLOR                                                    Plaintiff

v.

COLORADO STATE UNIVERSITY, *et al.*                    Defendant


## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff Steven L. Taylor's Motion to Reconsider,[1] (Docket No. 46), and Motion to Alter, Amend, or Vacate Judgment, (Docket No. 60). The former relates to the Court's Memorandum Opinion and Order entered October 18, 2012, which granted summary judgment in favor of Defendant Secretary of the Army. (Docket No. 42.) The latter relates to the Court's Memorandum Opinion, (Docket No. 55), and Order of final judgment, (Docket No. 58), entered December 10 and December 18, 2012, respectively. Defendant Secretary of the Army has responded to the former Motion, (Docket No. 57), and Plaintiff has replied, (Docket No. 59). Defendant Colorado State University has responded to the latter Motion, (Docket No. 62), and Plaintiff has replied, (Docket No. 63). These matters are now fully briefed and ripe for adjudication. Because these matters necessarily are related, the Court will address both of Plaintiff's Motions in this Opinion.

---

[1] Plaintiff's motion to reconsider is erroneously styled as a "Motion for Extension of Time to File Response." (*See* Docket No. 46, at 1.) This error apparently was a mere oversight, as his accompanying Memorandum correctly is styled in support of his "Motion to Reconsider." (*See* Docket No. 46-1, at 1.)

BACKGROUND

The facts pertinent to this action have been presented in full in the Court's two prior Memorandum Opinions. (Docket Nos. 42; 55.) In the interest of addressing completely Plaintiff's instant Motions, the Court again will recite the bulk of the background of this case. To the extent the Court limits its recitation of certain background facts here, any facts previously mentioned but not presented here are incorporated by reference.

I.      **Factual Background**

Plaintiff Steven L. Taylor worked as an agricultural technician at Fort Campbell, Kentucky. Taylor was hired by Colorado State University (CSU) to work for the Center for Environmental Management of Military Lands (CEMML), which enters into various agreements to provide support services for property owned by the U.S. military. Taylor's position was funded by a cost-reimbursable agreement between the U.S. Department of Agriculture (USDA) Forest Service and CSU, through its CEMML, to provide conservation, research, and resource management services on public lands controlled by the U.S. Department of Defense (DoD). That cost-reimbursable agreement provided specifically that either party could terminate the agreement, in whole or in part, at any time prior to its expiration on March 31, 2010. (*See* Docket No. 41-2, at 7.)

Taylor states that while he was working for the Montgomery County Soil Conservation Service conducting a biological survey for Fort Campbell, he was invited by Beth Boren to apply for a position at Fort Campbell to be funded by CSU. (*See* Docket No. 43-2, at 13-14.) Taylor recalls submitting an application and being interviewed over the phone; he also recalls being told when he was hired that he would be

assisting Boren in "any technical stuff she had." (Docket No. 43-2, at 14-15.) Taylor acknowledges that Boren was not employed by CSU, (*see* Docket No. 43-2, at 17-18), and states that Bob Brozca at CSU was his designated superior, (Docket No. 43, at 2; 43-2, at 15). Taylor was informed he had been hired by a January 25, 2001, appointment letter from CSU. (Docket No. 41-3.) In that appointment letter, Taylor was advised that his "position ha[d] been approved as a special appointment." (Docket No. 41-3.) It went on, "As is the case with all special appointments at Colorado State University, the position is dependent upon the availability of funding." (Docket No. 41-3.) The job description for Taylor's position also stated in the second sentence of the first paragraph, "Position contingent upon the availability of funds." (Docket No. 41-4.) Additionally, Taylor acknowledged in his deposition that he was informed his position depended on funding through the CEMML. (Docket No. 43-2, at 17.)

Taylor describes his job duties as making conservation plans, conducting prescribed burnings, coordinating with other agencies to help maintain military lands, and ensuring that farmers who were farming military lands under lease "kept their conservation going." (Docket No. 43-2, at 19.) Taylor's payroll checks were issued to him by CSU. (Docket No. 43-2, at 20.) In an apparent effort to clarify the employment status of CSU personnel, Taylor received a memorandum dated January 2001 at the time he was hired explaining, among other things, who Taylor was employed by and outlining his employment in relation to Fort Campbell and the DoD:

> SUBJECT: Employment Status and Information
>
> . . . . If you receive pay checks from CSU, you are an employee of the State of Colorado, not CERL, an installation, the Air Force, DOA, or DOD. Always identify yourself as a CSU employee to

> avoid confusion and potential problems. . . . I know many of you
> have been told you work for someone other than CSU, which is not
> the case.

(Docket No. 50-2, at 1.)

Boren, a DoD employee, was Taylor's point of contact for purposes CSU's contract at Fort Campbell. According to Taylor, "[h]is evaluations were conducted by his point of contact who was an Army employee," "[h]is Army supervisor established his work hours," and "[h]is Army supervisor also gave him his work assignments." (Docket No. 36, at 2-3; *see also* Docket Nos. 43, at 2; 43-2, at 20.) However, a memorandum provided to Taylor at the time he was hired informed him, "You and your POC [point of contact] *should discuss and agree on your daily activities*, work hours, and time off." (Docket No. 50-2 (emphasis added).) In her signed declaration, Boren expressly disclaims that her position as CSU's point of contact "[wa]s not a supervisory role." (Docket No. 50-5, at 1.) Consistent with the January 2001 memorandum Taylor received, Boren states: "Specific tasks and requirements were outlined in the Scope of Work (SOW) and the CSU employee and I would review these tasks to discuss particulars and the time line in which tasks were to be completed. Periodically, tasks were reviewed by both parties and time lines or procedures were adjusted due to unforeseen circumstances [but] very little day to day interaction was needed." (Docket No. 50-5, at 1-2.)

Taylor also says that Boren "promulgated the safety rules that [he] was required to follow"[2] and "was responsible for [his] annual performance evaluations." (Docket No.

---

[2] In support of his statement that Boren "promulgated . . . safety rules," Taylor cites page 54 of his deposition testimony, (Docket No. 43-2, at 54.) However, Taylor's testimony there was in response to questioning whether Boren had ever raised any performance concerns and discusses primarily a letter sent

43, at 2.)  However, the same January 2001 memorandum explains more clearly that Boren's role in the evaluation process, as Taylor's point of contact, was to receive and input responses to a CSU questionnaire, which Taylor would then sign and return to CSU.[3]  (*See* Docket No. 50-2, at 2.)   Boren also states in her signed declaration that: "only employees of CSU have the authority to . . . complete performance appraisals . . . . I merely verified or forwarded information to CSU personnel working with the [Agricultural Outlease Program]."  (Docket No. 50-5, at 1.)  Boren further avers: "My signature on performance evaluations was to verify that the CSU employee had completed their part.  I did not write the performance evaluations for Mr. Taylor or any other CSU employee." (Docket No. 50-5, at 1.)  Consistent with the January 2001 memorandum and Boren's statements, correspondence between CSU and Boren suggests that Boren was merely the go-between for transmitting Taylor's evaluation form from CSU to Taylor and then back to CSU.  (*See* Docket No. 50-4.)  Although CSU on at least one occasion invited Boren to provide feedback regarding Taylor's performance, this was apparently optional for Boren to do, and CSU reiterated at that time that CSU was responsible for completing Taylor's evaluation.  (*See* Docket No. 50-4.)

Taylor states that he is an alcoholic and a diabetic, but that while these diseases significantly impact his ability to lead a normal life, "neither . . . has ever affected in any way his ability to do his job in an excellent manner."  (Docket No. 36, at 3.)  Taylor avers

---

by Boren to Dr. Steve Warren at CSU indicating safety concerns with Taylor wearing shorts rather than pants to work.  (*See* Docket No. 43-2, at 52-54.)

[3] In fact, Taylor's most recent evaluation form dated May 2008 lists his supervisor as Dr. Warren and is signed by Dr. Warren and Angela Thompson, the CEMML Director—nowhere on the evaluation does Boren's name or signature appear.  (Docket No. 50-3, at 1.)

that when he needed to take time off work to attend a rehabilitation program for his alcoholism, "it was Boren who preapproved his leave." (Docket No. 43, at 2 (referencing Docket No. 43-2, at 28).) This statement, however, appears contrary to the documentary evidence of record for several reasons. For one, the medical certification form Taylor was required to submit for FMLA leave was a CSU form to be completed by Taylor and his treating physician; it appears to have nothing to do with Boren, the DoD, or Fort Campbell. (*See* Docket No. 41-13.) Second, the notification letter informing Taylor that his request for FMLA leave had been approved was on a CSU form and was completed and signed by CSU/CEMML human resources director Angela Thompson, and that letter informed Taylor that he should contact Thompson if his expected return date changed. (*See* Docket No. 41-14, at 2.) Third, Boren, in her signed declaration, states that because "[t]he POC is not a supervisory role . . . only employees of CSU have the authority to approve leave." (Docket No. 50-5, at 1.) According to Boren, her "signature on leave documents was to verify, not approve, that these documents were accurate before reported to CEMML." (Docket No. 50-5, at 1.)

Taylor additionally states that it was his "understanding of his relationship with Boren that he needed to go to her first, then go to CSU for his work issues, if necessary." (Docket No. 43, at 2 (referencing Docket No. 43-2, at 25).) But this statement is also contradicted by the documentary evidence of record. Namely, the January 2001 memorandum Taylor received when he was hired informed him that "questions concerning payroll, benefits, leave policies, employment regulations, worker's compensation, etc." should be directed to CSU/CEMML human resources. (Docket No. 50-2, at 1.) That memorandum also informed Taylor that should a difficult situation

develop with his point of contact (*i.e.*, Boren), he should contact CSU, as well as that all "leave report forms" for annual or sick leave should be sent to CSU.  (Docket No. 50-2, at 1.)

Finally, Taylor avers that the DoD "supplied [him] with much of the equipment he used in his work, such as four-wheelers and tractors."  (Docket No. 43, at 2 (referencing Docket No. 43-2, at 55).)  However, the cost-reimbursable agreement between the USDA Forest Service and CSU expressly provides that CSU is responsible for providing all "equipment needed for work under this agreement," and states that "[f]ederal funding under this instrument is not available for reimbursement of [CSU's] purchase of equipment."  (Docket No. 41-2, at 5, 9.)  The "Agricultural Outlease Program Support" guidelines further delineate what equipment was to be government-furnished ("[o]ffice space, furniture, computer equipment, telephone, . . .") and what was to be provided by CSU/CEMML (cellular phone service, work boots, and personal protective equipment).  (Docket No. 50-1.)  And according to Boren, "[t]raining, travel, work boots, and Personal Protective Equipment (PPE) were the responsibility of CSU."  (Docket No. 50-5, at 2.)  Boren further states:  "Equipment maintained by AOP [the Agricultural Outlease Program] was purchased for use by all Environmental Division Branch and other Division personnel in support of the mission at Fort Campbell.  This equipment was in use by the AOP prior to initiation of any contract with CSU or its personnel."  (Docket No. 50-5, at 2.)

Taylor was advised by his doctor in the summer of 2008 that he should immediately enter a rehabilitation clinic because of the aggravating effect his alcoholism was having on his diabetes.  (Docket No. 36, at 3.)  Taylor states he "contacted his point

of contact with the Army to notify her that he would need to use some of his accrued time off, to which she "indicated very bluntly that she was not going to permit an alcoholic to work for her. (Docket No. 36, at 3.) Specifically, he alleges that she responded, "I'm not working with no F-ing alcoholic." (Docket No. 43-2, at 46-47.) Shortly thereafter, Boren emailed Dr. Steve Warren at CSU requesting "CEMML to have all the government keys . . . issued to [Taylor] to be returned immediately by mail to Fort Campbell." (Docket No. 41-9.) For his part, Boren denies making the remarks Taylor alleges, stating:

> I did not, at any time, make any discriminating or derogatory statements to or about Steve Taylor or his medical conditions. . . . In fact, two years previous, when he told me he needed to seek treatment for his alcoholism, I encouraged him to do so and supported him fully. . . . At no time did I ever say I would not work with an alcoholic, not two years ago, and not in 2008. I simply made no such statement to Mr. Taylor or anyone else.

(Docket No. 50-5, at 3.)

Thompson, the CSU/CEMML human resources director, was contacted on June 25, 2008, by Deniece Gillispie, Taylor's daughter, who informed Thompson of Taylor's medical conditions and that he would need to take leave. (Docket No. 43-4, at 1.) Gillispie related to Thompson that Taylor "was having problems" with Boren and that Boren had "made remarks to [him] that indicated an intolerance for individuals who are alcoholics." (Docket No. 43-4, at 1.) Gillispie also asked whether there might be other positions available through CSU at Fort Campbell. (Docket No. 43-4, at 2.) On June 27, 2008, Thompson responded by emailing Gillispie a CSU medical certification form for Taylor to complete for FMLA purposes and advising Gillispie as to two possible upcoming job openings with CSU. (Docket Nos. 41-10; 43-4, at 2.)

Also on June 27, 2008, Dr. Warren wrote to Thompson in response to Gillispie's email, advising Thompson, "If Steven [Taylor] is entitled to any assistance through the CSU Benefits Office, we should let him know."  (Docket No. 43-5, at 1.)  Thompson replied to Dr. Warren, informing him that she had sent the FMLA forms to Gillispie and stating:

> We should not do anything negative to [Taylor] based on this, including removing his keys and access card.  As far as I know, he has never had performance problems and has never been under the influence at work.  With all the information I have at this point, we should only consider him out on sick leave for 2 weeks.  No action against him is needed.

(Docket No. 43-5, at 1.)  Thompson also noted that based on what Gillispie had told her, it appeared Boren had "crossed the line."  (Docket No. 43-5, at 1.)  In accordance with Thompson's recommendation and in spite of Boren's request, CSU made no effort to obtain Taylor's keys.  (Docket No. 43-4, at 2.)

On July 8, 2008, Taylor submitted his CSU medical certification form indicating he would be absent from work through July 20.  (*See* Docket Nos. 41-13; 43-4, at 2.) CSU approved Taylor for FMLA leave, and Thompson contacted CSU's Office of Equal Opportunity and Diversity to advise them that Taylor may need to be assessed to determine whether he meets the disability requirements under the Americans with Disabilities Act (ADA).  (Docket No. 43-4, at 3.)

Then on July 15, 2008, Dr. Warren received an email notifying him that Fort Campbell wanted to terminate its agreement with CSU as of July 21.  (Docket No. 41-16.)  And on July 17, the USDA Forest Service received a Military Interdepartmental Purchase Request reflecting a new termination date of July 21, 2008.  (Docket No. 41-

17.)  That same day, Dr. Warren wrote to Taylor informing him that the USDA Forest Service wished to terminate its agreement with CSU effective July 21.  (Docket No. 41-18.)  Dr. Warren further advised Taylor:

> Due to the termination of the Agreement by the Forest Service, and pursuant to your appointment letter dated January 25, 2001, which reiterates that your position is "dependent upon the availability of funding", CSU will no longer have funding to continue your employment. . . .
>
> Should you be willing to relocate, please feel free to call Angela Thompson in the [CEMML] Human Resources Office, or log on to the CEMML website to see what positions might be available with CEMML.  You will be given full consideration for any position for which you may qualify.

(Docket No. 41-18.)  Taylor learned of Warren's letter after he left the rehabilitation program.  (*See* Docket No. 41-8, at 14.)

Taylor alleges that he was terminated by the Army and CSU because of his disability.  (*See* Docket No. 26, at 3.)  Taylor retained legal counsel on or before September 30, 2008, as evidenced by his letter through counsel to the Department of Agriculture.  (See Docket Nos. 36-4; 35-3.)  Taylor avers that in relying on CSU's contract with the USDA, "[H]e initially believed that any complaint of employment discrimination should be filed with the Agriculture Department."  (Docket No. 36, at 4.)  Taylor states that "[b]y April 6, 2009, [he] had discovered that his supervisor was not a Department of Agriculture employee, but was in fact employed by the Army."  (Docket No. 36, at 4.)  On April 7, Taylor mailed complaints against the DoD and CSU to the Equal Employment Opportunity Commission (EEOC).  (Docket Nos. 36, at 5; 36-6, at 1-4.)  Taylor's counsel states that "on or about April 15, 2009, counsel was contacted by

the EEOC and informed that Taylor "would have to repeat the counseling and complaint process, this time with the Army at Fort Campbell, Kentucky rather than directly through the EEOC." (Docket No. 36, at 5.)

On May 6, 2009, Taylor contacted an Army EEO Counselor at Fort Campbell to initiate an informal complaint regarding his termination. (Docket Nos. 36, at 5; 36-6, at 1.) Then on July 28, 2009, Taylor received a "Notice of Right to File a Formal Complaint" against the Army. (Docket Nos. 36, at 5; 36-7.) Taylor filed a formal complaint of discrimination on August 12, 2009. (Docket Nos. 36, at 5; 36-8.) The Army EEO Officer dismissed Taylor's complaint on August 28, 2009, for two reasons. First, the EEO Officer concluded that there was no valid employer-employee relationship between the Army and Taylor because Taylor's employment was the result of an agreement between CSU and the USDA Forest Service, not CSU and either the Army or the DoD. (*See* Docket No. 36-9, at 1-2.) Second, the EEO Officer concluded that Taylor's complaint was untimely under 29 C.F.R. § 1614.107(a)(2) because: "[Taylor's] termination from [CSU] happened on July 17, 2008, and his initial EEO contact was on May 6, 2009. This is well beyond the 45-day limitation of making timely EEO contact in order in order for this formal complaint to be accepted within the administrative procedures." (Docket No. 36-9, at 2.)

Taylor then appealed the Army EEO Officer's decision to the EEOC Office of Federal Operations, arguing (1) that he was an employee of the Army and (2) that he was entitled to a mandatory extension of the 45-day limitation period under 29 C.F.R. § 1614.105(a)(1). The EEOC issued its decision on May 19, 2011, affirming the agency's decision and again concluding that Taylor "was not an employee of the [Army],

but of CSU, a contractor of the Forest Service." (Docket No. 36-10, at 3.)   At that time, the EEOC mailed a copy of its decision to Taylor, but not Taylor's counsel. (*See* Docket No. 36-10, at 5.)   That decision included Taylor's right-to-sue notice.  (*See* Docket No. 36-10, at 4.)   Then on October 13, 2011, the EEOC reissued its May 19 decision, this time sending a copy to Taylor's counsel with a cover letter explaining the mistake of failing to initially copy counsel was "due to a clerical error."  (Docket No. 36-11, at 1.) That letter went on to state that "the date on the attached Certificate of Mailing will govern any time frames related to the parties' receipt of the decision."  (Docket No. 36-11, at 1.)

## II.      Procedural Background

On March 7, 2011, Taylor filed the instant suit against CSU, (Docket No. 1.), and on April 19, 2011, amended his Complaint to make a technical change to the named defendant, (*see* Docket No. 6).   Taylor then sought leave on December 16, 2011, to file a Second Amended Complaint adding the Secretary of the Army as a codefendant, (Docket No. 22), which the Court granted on January 3, 2012, (Docket No. 25).

### A.      The Army's Motion for Summary Judgment and the Court's Decision

Defendant Secretary of the Army filed its motion to dismiss or, in the alternative, for summary judgment on April 4, 2012.  (Docket No. 35.)  The Army argued first that Taylor failed to timely exhaust his administrative remedies prior to filing suit, and second that Taylor's judicial complaint should be dismissed as time-barred.  In response, Taylor asserted that the 45-day limitation under 29 C.F.R. § 1614.105(a) should be tolled either because he was unaware of the limitation period or because he was unaware at the time of his termination that it was in fact the Army that decided to terminate his employment.

Taylor further argued that his judicial complaint against the Army should not be time-barred by the ninety-day limitation under 42 U.S.C. § 2000e-16(c) because, despite mailing a copy of its May 19 decision and right-to-sue notice to Taylor, the EEOC did not mail a copy to Taylor's counsel until nearly five months later on October 17, 2011.

In its October 18, 2012, Memorandum Opinion, the Court first held that "Plaintiff's ninety-day limitation period began to run five days after the May 19, 2011, decision and right-to-sue notice was mailed by the EEOC to his home address of record." (Docket No. 42, at 8-9.)  The Court reasoned that "[t]he Sixth Circuit strictly adheres to Title VII's ninety-day limitation" and "has repeatedly found that the ninety-day clock begins to run when a claimant receives notice, regardless of whether his attorney contemporaneously receives a copy as well."  (Docket No. 42, at 7.)  The Court further reasoned that "the Sixth Circuit has flatly rejected the argument that a failure by the EEOC to copy counsel on a right-to-sue letter prevents the ninety-day period from running."  (Docket No. 42, at 9.)

Second, the Court also held that 29 C.F.R. § 1614.605(d)'s language that "time frames for receipt of materials shall be computed from the time of receipt by the attorney" applies to EEOC administrative proceedings, not the ninety-day limitations period for filing suit.  (Docket No. 42, at 10.)  The Court reasoned that in addition to the "litany of decisions in this circuit finding that a properly mailed notice is presumed to have been received and that the ninety-day limitation period begins upon such receipt," the plain language of § 1614.605 does not suggest that "the EEOC intended to govern the ninety-day time limitation period for filing a judicial complaint in U.S. district courts." (Docket No. 42, at 10.)  The Court buttressed this reading by looking to the following

subsection, § 1614.605(e), which unequivocally states, "The Complainant shall at all times be responsible for proceeding with the complaint whether or not he or she has a designated representative."  (Docket No. 42, at 10.)

Finally, the Court addressed and rejected Taylor's arguments for equitable estoppel and equitable tolling, finding neither were warranted under the circumstances of this case. (Docket No. 42, at 11-14.)  Because the Court found the issue of the timeliness of Taylor's judicial complaint dispositive, it did not address whether he properly exhausted his administrative remedies prior to filing suit.  (*See* Docket No. 42.)

### B.  CSU's Motion for Summary Judgment and the Court's Decision

CSU filed its Motion for Summary Judgment on October 1, 2012.  (Docket No. 41.)  CSU argued that summary judgment was appropriate for several reasons:  (1) CSU did not violate the ADA because it did not discriminate against Taylor on the basis of his disability when his employment was terminated; (2) CSU also did not violate the Vocational Rehabilitation Act of 1973 (Rehabilitation Act), and Taylor has presented no evidence showing he was terminated solely because of his disability; (3) the DoD is not Taylor's joint employer and, therefore, the motives and actions of the DoD cannot be attributed to CSU; and (4) because Boren was not CSU's agent, CSU cannot be not liable for her actions under *respondeat superior*.  (Docket No. 41-1, at 8, 11, 12, 14.)  Taylor responded with essentially two lines of argument: (1) that CSU was aware of Boren's conduct and terminated him anyway, which he reasoned presented facts on which "a reasonable jury could conclude that [his] termination was based on his disability"; and (2) that CSU should be liable for the DoD and Boren's actions "under the 'joint employer' doctrine."  (Docket No. 43, at 4-5.)

In its December 10, 2012, Memorandum Opinion, the Court held that Taylor's ADA claim failed as a matter of law because Taylor had produced no direct evidence of discrimination on the part of CSU in terminating his position.  (Docket No. 55, at 16.)  The Court further found that even had Taylor established a *prima facie* case, the evidence of record supported CSU's position that it had a legitimate, nondiscriminatory explanation for the adverse employment decision suffered by Taylor, which Taylor had offered no evidence tending to show was merely pretext for CSU's true discriminatory intent.  (Docket No. 55, at 15-16.)  The Court similarly held that Taylor's Rehabilitation Act claim failed because Taylor had presented no genuine issues of material fact as to whether "CSU terminated him because of his handicap, much less *solely by reason of* his handicap."  (Docket No. 55, at 16.)

The Court also held that CSU was not liable for the DoD's motives or actions regarding Taylor's termination under either the "joint employer" doctrine or *respondeat superior.*  (Docket No. 55, at 17.)  The Court found that based on the factors considered by the Sixth Circuit and other courts in determining whether a joint-employer relationship exists, Taylor had presented no genuine issues of material fact that the DoD was Taylor's joint employer along with CSU.  (Docket No. 55, at 17-21.)  The Court further found that CSU was not liable for Boren's actions under *respondeat superior* because Boren was not CSU's agent, reasoning that Taylor had produced no evidence "[o]ther than his conclusory statements that Boren was CSU's agent" to "suggest[] that Boren acted on behalf of CSU within the scope of her employment or was in any way subject to CSU's control."  (Docket No. 55, at 21-22.)

Accordingly, the Court granted summary judgment in favor of CSU, (Docket Nos. 55; 56), and entered a separate Order of final judgment dismissing this action, (Docket No. 58),

### C. Taylor's Motions to Reconsider

Taylor filed his Motion to Reconsider the Court's grant of summary judgment in favor of the Army on October 31, 2012.  (Docket No. 46.)  Taylor then filed his Motion to Alter, Amend, or Vacate the Court's grant of summary judgment in favor of CSU on January 7, 2013.  (Docket No. 60.)   In the latter Motion, Taylor requested in the alternative that the Court amend its December 18, 2012, Order of final judgment, (Docket No. 58), to an interlocutory order rather than a final judgment.  (*See* Docket No. 60, at 2.) Taylor argued that if the Court were to grant his Motion to Reconsider regarding the Army, he would be placed in the difficult position of prosecuting an appeal of the Court's decision regarding CSU while simultaneously litigating his case against the Army before this Court; however, if the Court were to deny his Motion to Reconsider regarding the Army, he could instead file a single appeal for all of his claims.  Recognizing the interests served by avoiding a piecemeal appeal, and finding that no party would be unduly prejudiced and that the interests of judicial economy would be served by granting this request, the Court entered an Order on January 9, 2013, amending its prior Order of final judgment to an interlocutory judgment and reopening this case pending resolution of Taylor's instant Motions to Reconsider.  (Docket No. 61.)

STANDARD

"District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008). "A district court may modify, or even rescind, such interlocutory orders." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). However, because there is an interest in the finality of a decision, a court should grant motions for reconsideration sparingly, *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992), and "only if the prior decision appears clearly to be legally or factually erroneous," *Mobley v. Warden London Corr. Inst.*, 2010 WL 3586964, at *2 (S.D. Ohio Sept. 13, 2010); *accord Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) ("Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.").

Taylor timely filed both his instant Motions pursuant to Fed. R. Civ. P. 59(e), which requires that a motion to alter or amend a judgment be filed no later than twenty-eight days after entry of the judgment. The Sixth Circuit has consistently held that a Rule 59 motion should not be used to reargue a case on the merits. *See Whitehead v. Bowen*, 301 F. App'x 484, 489 (6th Cir. 2008) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)). Instead, "[u]nder Rule 59, a court may alter or amend a judgment based on: '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). "A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion . . . ." *Id.*

DISCUSSION

I.      **Taylor's Motion to Reconsider Summary Judgment in Favor of the Army**

Taylor's Motion to Reconsider relative to the Court's grant of summary judgment in favor of the Army focuses solely on whether 29 C.F.R. § 1614.605 is applicable to the ninety-day limitations period for filing suit in federal court.  (Docket No. 46-1, at 4.)  He argues that the Court should reconsider its prior decision because the Sixth Circuit case law relied on by the Court involved equitable tolling and did not address the applicability of § 1614.605(d).  Thus, he reasons that because the Sixth Circuit has not addressed specifically the applicability of § 1614.605(d) to the ninety-day statute of limitations, there is no binding authority requiring dismissal of his claim against the Army.  He further reasons that the persuasive authority addressing § 1614.605(d) is contradicted by the Sixth Circuit's decision in *Jackson v. Richards Med. Co.*, 961 F.2d 575, 584 (6th Cir. 1992).  (Docket No. 46-1, at 4.)  Notably, however, Taylor makes no argument that there was  "a clear error of law," "newly discovered evidence," "an intervening change in controlling law," or "a need to prevent manifest injustice" such as would justify relief under Fed. R. Civ. P. 59(e).  *See Leisure Caviar*, 616 F.3d at 615.

The principal persuasive authorities relied upon by the Court were *Carter v. Porter*, 258 F. App'x 475 (3d Cir. 2007), and *Harris v. Bodman*, 538 F. Supp. 2d 78 (D.D.C.), *aff'd*, 2008 WL 5532102 (D.C. Cir. Aug. 27), *reh'g en banc denied*, (D.C. Cir. Dec. 12, 2008).  Taylor primarily takes issue with the Third Circuit's holding in *Carter*. He argues that "the Court should reject *Carter*'s reasoning that the EEOC has no authority to issue regulations that are binding on the Court concerning the running of the 90 day limitations period."  (Docket No. 46-1, at 8.)  But this argument is misplaced,

because the Court did not rely on that reasoning in its holding—in fact, the Court specifically relegated to a footnote any and all discussion of *Carter*'s reasoning on this point.  (Docket No. 42, at 10 n.2.)  Rather, the Court based its decision on two grounds: (1) the numerous Sixth Circuit decisions holding that a properly mailed notice is presumed to have been received and that the ninety-day period begins upon such receipt, and (2) the plain language of § 1614.605, which concerns itself with times frames for receipt of materials relative to the EEOC administrative process and does not appear intended to govern the ninety-day limitation period for filing suit in federal court.  (*See* Docket No. 42, at 10.)  The Sixth Circuit's decision in *Jackson* is therefore inapposite to this case.   *Jackson* dealt with whether the EEOC had authority to reconsider determinations when doing so would necessarily affect the start of the ninety-day limitations period.   *See* 961 F.2d at 580-85.   In the case at hand, there was no "reconsideration."  Instead, the EEOC merely reissued the same final decision and right-to-sue notice to correct the clerical mistake of not copying Taylor's attorney.  Thus, even assuming Taylor is correct that *Jackson* undercuts *Carter*'s rationale regarding the EEOC's authority, it would not alter the Court's prior holding.

Taylor seeks, in effect, nothing more than a "second bite at the apple" here.  As the Court previously noted, Taylor does not dispute that the EEOC sent him its final decision and right-to-sue notice on May 19, 2011, nor does Taylor deny that he received a copy of that decision.  He does not claim that the EEOC improperly addressed the mailing.  He simply reasserts his previously rejected arguments that (1) the EEOC violated § 1614.605(d) by sending him a copy of its final decision and right-to-sue notice but failing to copy his attorney, and (2) the ninety-day limitation period should not begin

until the EEOC corrected that error by resending both him and his attorney copies of its final decision and right-to-sue notice on October 13, 2011.  These arguments do not justify relief under Fed. R. Civ. P. 59(e).  For this reason, his Motion to Reconsider the Court's grant of summary judgment in favor of the Army must be DENIED.

## II.   Taylor's Motion to Reconsider Summary Judgment in Favor of CSU

Taylor's Motion to Reconsider relative to the Court's grant of summary judgment in favor of CSU focuses solely on the Court's ruling concerning the joint-employer doctrine.  (Docket No. 60-1, at 2.)  Taylor specifically requests that the Court reconsider its decision that there was insufficient evidence for a reasonable jury to conclude that the Army was Taylor's joint employer.  (Docket No. 60-1, at 2.)  Again, however, Taylor makes no argument that there was  "a clear error of law," "newly discovered evidence," "an intervening change in controlling law," or "a need to prevent manifest injustice" such as would justify relief under Fed. R. Civ. P. 59(e).  *See Leisure Caviar*, 616 F.3d at 615.

Taylor insists that the Court erred in granting CSU summary judgment because he presented sufficient evidence of the existence of a joint-employer relationship between the Army and CSU to create a material issue of fact precluding summary judgment. However, in responding to CSU's motion for summary judgment, Taylor cited only to his own testimony in which he stated that he considered Boren his day-to-day supervisor. CSU, on the other hand, submitted considerable evidence showing that the relationship between it and the Army, as it pertained to Taylor's employment, was not that of a joint employer.  The Court considered this evidence, as well as Taylor's testimony, in its prior Memorandum Opinion.  (Docket No. 55, at 17-21.)  Taylor does not argue in his instant Motion, nor does the Court find, that there is any ambiguity in the evidence presented by

CSU in support of its motion for summary judgment.  Taylor does argue, however, that the Court failed to give him the benefit of all reasonable inferences.

Certainly, in determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  But "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  A party cannot rely on conjecture or conclusory statements but instead "must be able to show sufficient probative evidence [that] would permit a finding in [his] favor." *Lewis v. Phillip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (alterations in original) (internal quotation marks omitted); *see also Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996) ("[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment."), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

Contrary to Taylor's current position, however, the inference that Boren wanted to fire Taylor does not equate to an inference that the Army is Taylor's joint employer.  As the Court previously found, CSU has come forward with significant evidence "throughout Taylor's employment show[ing] that Boren had no apparent control over Taylor's work," yet Taylor has produced no evidence to support his bare assertions to the contrary.   (Docket No. 55, at 19.)   In granting CSU summary judgment, the Court addressed each of Taylor's assertions and found them without evidentiary support, particularly in light of the evidence presented by CSU.  (*See* Docket No. 55, at 18-21.)

Specifically, the Court found "no evidence suggesting that CSU ever consulted with the DoD regarding Taylor's pay or benefits, nor that the DoD had any authority to control Taylor's daily activities or reject his employment," "no evidence to suggest that the DoD had the authority to terminate Taylor," "nothing to suggest that the DoD or anyone outside CSU had the authority to decide whether ultimately to hire Taylor," and "nothing to suggest that the DoD or Boren had any control whatsoever over Taylor's compensation." (Docket No. 55, at 19-20.)  The Court additionally found that  "the evidence reflects that the essential terms and conditions of Taylor's employment were squarely within the control of CSU, not the DoD,"  that "Taylor's own testimony shows that he still had to apply to CSU for the job and interview with CSU personnel," that "[Taylor] was paid directly by CSU, and CSU provided all the benefits of his employment," and that "when [Taylor] requested leave, he did so through CSU, which was then considered and approved solely by CSU."  (Docket No. 55, at 20.)   These conclusions were based on the evidence presented by CSU and the lack of evidence, other than his own assertions, presented by Taylor.  Thus, Taylor's position that the Court failed to give him the benefit of all reasonable inferences is without merit.

Ultimately, Taylor has failed to provide any proper basis under Fed. R. Civ. P. 59(e)—*i.e.*, that there was  "a clear error of law," "newly discovered evidence," "an intervening change in controlling law," or "a need to prevent manifest injustice"—for the Court to reconsider and set aside its prior Order granting CSU summary judgment.  For this reason, his Motion to Reconsider the Court's grant of summary judgment in favor of CSU must be DENIED.

CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff Steven Taylor has presented no argument that would justify relief under Fed. R. Civ. P. 59(e) from either of the Court's prior Orders granting summary judgment in favor of the Army or CSU. Accordingly;

IT IS HEREBY ORDERED that Plaintiff's Motion to Reconsider, (Docket No. 46), is DENIED;

IT IS HEREBY FURTHER ORDERED that Plaintiff's Motion to Alter, Amend, or Vacate Judgment, (Docket No. 60), also is DENIED.

An appropriate order of dismissal will issue concurrently with this Opinion.

Date:



cc:       Counsel